Christopher Lovrien, CA Bar No. 230546
Joseph J. Boylan, CA Bar No. 331991
Joshua M. Mester, CA Bar No. 194783
JONES DAY
555 S. Flower St., 50th Floor
Los Angeles, CA 90071
Telephone:      +1.213.489.3939
Facsimile:      +1.213.243.2539
Email:          cjlovrien@jonesday.com
Email:          jboylan@jonesday.com
Email:          jmester@jonesday.com

Darren Cottriel, CA Bar No. 184731
JONES DAY
3161 Michelson Dr., # 800,
Irvine, CA 92612
Telephone:      +1 949.851.3939
Facsimile:      +1 949.553.7539
Email:          dcottriel@jonesday.com

*Attorneys for Plaintiffs*

[*Additional counsel listed on signature page.*]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

|  |  |
|---|---|
| COMPEER FINANCIAL, ACA COMPEER FINANCIAL, PCA, and COMPEER FINANCIAL, FLCA, <br><br> *Plaintiffs,* <br><br> v. <br><br> MICHAEL GRAHAM, CYNTHIA GRAHAM, DENNIS MORGAN, KRISTI INESS, and JD INVESTMENTS, <br><br> *Defendants.* | Civil Action No. 1:25-cv-00049 <br><br> **COMPLAINT** <br><br> 1. Conversion <br> 2. Aiding and Abetting Conversion <br> 3. Money Had and Received <br> 4. Civil Theft [Cal. Penal Code § 496(c)] <br> 5. Actual Fraudulent Conveyance [Cal. Civ. Code § 3439.04(a)(1)] <br> 6. Constructive Fraudulent Conveyance [Cal. Civ. Code § 3439.04(a)(2)]; <br> 7. Constructive Fraudulent Conveyance [Cal. Civ. Code § 3439.05] <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Compeer Financial, ACA (f/k/a AgStar Financial Services, ACA), Compeer

Financial, PCA (f/k/a AgStar Financial Services, PCA), and Compeer Financial, FLCA (f/k/a

AgStar Financial Services, FLCA), each of which conduct certain business as Agri-Access®

(collectively "Plaintiffs"), by and through their undersigned attorneys, bring this Complaint against the above-captioned Defendants and allege, on knowledge as to their own acts and on information and belief as to all other matters, as follows:

**INTRODUCTION**

1.     Plaintiffs bring this action to recover and prevent further dissipation of $35,187,975.81 in stolen, traceable funds belonging to Plaintiffs.  Earlier this year, Corporate America Lending, Inc. ("CAL") stole $58,187,976.50 of traceable proceeds from the repayment of two loans CAL made, the proceeds of which are Plaintiffs' property.  CAL and its CEO, Ron Cook, then fraudulently transferred more than $35 million of those funds to members of Mr. Cook's inner circle: Dennis Morgan and his company JD Investments, Kristi Iness, and Michael and Cynthia Graham (collectively, "Defendants").  Mr. Cook testified under oath on October 22, 2024 that he made those transfers to Defendants for no consideration and with the intent to hinder and delay Plaintiffs' recovery and possession of their property.  Defendants therefore unlawfully and fraudulently received and possess the at-issue funds, and they refuse to return them.

2.     Plaintiffs are entitled to the funds under a 2015 contract (the "MPA", defined below) between Plaintiffs and CAL, which is an originator of agricultural loans.  Pursuant to the MPA, from time to time CAL offered and Plaintiffs purchased participation interests in agricultural loans originated by CAL.

3.     As relevant to this action, in 2018 and 2021, Plaintiffs paid CAL $58 million to purchase 100% participation interests in loans CAL originated to the Famoso borrowers  (the "Famoso Loans").  When the borrowers refinanced the Famoso Loans at the end of April 2024, CAL received $58,187,976.50 in full repayment of the loans.  Pursuant to the MPA, those specific, identifiable funds (the "Payoff Proceeds") were Plaintiffs' property, and CAL was required to remit them to Plaintiffs promptly upon receipt.

4.     Rather than remit the Payoff Proceeds, as required, CAL's CEO Ron Cook stole the funds and tried to conceal his actions.  On May 2, CAL sent Plaintiffs a wire transfer purporting to be a regular principal and interest payment for the month of May (the "Fake May

COMPLAINT

Payment"). That was a lie: there was no May payment for the Famoso Loans because they had already been fully repaid on April 29th.

5.    Later in the day on May 2, after receiving the Fake May Payment and being generally aware of the impending repayment of the Famoso Loans (though not aware of the precise timing and details), Plaintiffs confronted CAL and demanded turnover of the Payoff Proceeds. CAL refused and Ron Cook all but disappeared.

6.    Plaintiffs later learned that CAL and Ron Cook used the Fake May Payment and their subsequent radio-silence to buy CAL time to siphon the Payoff Proceeds into accounts held by the Defendants and sequester them out of Plaintiffs' reach. Specifically, on May 3, 2024, *after* Plaintiffs had demanded return of the Payoff Proceeds, CAL initiated two wire transfers for approximately $12 million and $5.4 million to two accounts held by Ron Cook's close associates, Defendants Dennis Morgan (and his company JD Investments) and Michael and Cynthia Graham. Over the coming weeks (and unbeknownst to Plaintiffs), on May 6 and May 22, CAL made additional wire transfers to the Defendants' accounts. By the end of May, CAL had moved a total of $35,187,975.81 of the traceable Payoff Proceeds from CAL's bank account to the Defendants' accounts and likely moved the remainder of the Payoff Proceeds to other parties dissipating the entirety of the Payoff Proceeds without Plaintiffs' knowledge.

7.    Without any knowledge of the transfers, and in an effort to protect their interest in the Payoff Proceeds, Plaintiffs initiated arbitration on May 14, 2024. The following day, Plaintiffs sought the appointment of an Emergency Arbitrator and an interim award to secure the Payoff Proceeds. Then, on May 21, 2024, Plaintiffs filed a lawsuit for injunctive relief in aid of the arbitration in the U.S. District Court for the District of Minnesota to secure the Payoff Proceeds until the Emergency Arbitrator was appointed by the AAA and available for a hearing.

8.    Over the course of the next several months, Plaintiffs obtained numerous orders requiring CAL and Ron Cook to place the Payoff Proceeds in a segregated, interest-bearing escrow account and to provide detailed financial records and other information regarding the location and status of the Payoff Proceeds. The orders obtained by Plaintiffs include a May 29, 2024 order from the United States District Court for the District of Minnesota, four orders and

COMPLAINT

awards from the Emergency Arbitrator, an Interim Award from the full merits panel in the arbitration, and, most recently, a Sanctions Order from the merits panel.

9.    At every step, CAL refused to comply.  While CAL has repeatedly pretended to undertake efforts to reacquire the funds and open a compliant escrow account, to this day *none* of the disputed funds have been placed in escrow in accordance with the court and arbitral orders and awards.  CAL has been repeatedly sanctioned for this misconduct, but those sanctions have yet to achieve the desired effect of compliance.

10.    CAL likewise stonewalled Plaintiffs' efforts to obtain additional information about what CAL did with the Payoff Proceeds, until Mr. Cook was forced to testify under oath before the merits arbitration panel on October 22.  During that hearing, Mr. Cook revealed for the first time that he had transferred more than $35 million to the Defendants—all close friends and business associates he has known for many years, and with whom he has numerous deep relationships (one is an insider of CAL, the CFO, and the others are Cook's business partners).  Mr. Cook also testified that those transfers had been made on a "handshake" basis for no consideration, and that all that was needed to reacquire the funds was for him to ask for them back (which he testified he had never done, despite his prior sworn statements to the contrary).

11.    Following that evidentiary hearing, which lasted two full days, on October 23, 2024 the arbitration panel preliminarily ordered counsel for CAL to email each of the Defendants to inform them that the funds they had received from Ron Cook were "the property of another party and not the property of CAL or Mr. Cook."  CAL's counsel transmitted those emails on the same day.  10.23 Graham Email (Ex. # 18); 10.23 Graham Email (Ex. # 19); 10.23 Iness Email (Ex. # 20); 10.23 Morgan Email (Ex. # 21); 10.24 Morgan Email (Ex. # 22).[1]

12.    A few days later, on October 28, 2024, the arbitration panel issued a detailed written order requiring CAL to reacquire the funds Mr. Cook transferred to the Defendants and place the entirety of the Payoff Proceeds in a compliant escrow account by November 15, 2024.  Among other things, that order found that "Compeer has shown a likelihood that it will prevail

---

[1] Plaintiffs are separately submitting a compendium containing the exhibits referenced in their Complaint.

on the merits of its claims to ownership of the Payoff Proceeds, [] while CAL has failed to show that it would be materially harmed by the requirement of preservation." That order also provided that: "Neither CAL nor Compeer, nor anyone acting in concert with them, shall take any action to dispose, dissipate, encumber, or otherwise impair the value of the Payoff Proceeds or the escrow account, except as permitted by order of this Panel."

13.    On November 15, 2024, the deadline for compliance, CAL once again refused. Instead, it submitted (among other things), another sworn declaration from Ron Cook claiming—for the first time—that each of the Defendants had refused to return the Payoff Proceeds because the funds they had received were given in "repayment of obligations owed by CAL."  Cook Decl. (AAA Arb. Nov. 15, 2024) ( "Cook Decl.") (Ex. #1).  That assertion directly conflicts with numerous representations made by CAL and its counsel, and with Mr. Cook's sworn testimony.  And neither CAL nor the Defendants have offered any information regarding the nature or amount of those purported obligations.

14.    Thus, despite notice that the transferred funds belong to Plaintiffs, the Defendants unjustifiably refuse to return the funds.  Upon information and belief, Defendants— all close friends and business partners of Mr. Cook—have unlawfully and fraudulently received and improperly refuse to return the stolen funds (received without consideration) to aid Mr. Cook and hinder Plaintiffs' recovery efforts.

15.    CAL's continuing and willful defiance of court and arbitral orders led the arbitration merits panel to issue a sanctions order on November 26, 2024, in which the panel expressed concern that CAL and Mr. Cook "misled the Panel relative to the disposition of the Payoff Proceeds" and warned that further failure to comply would result in additional sanctions. Sanctions Order at 2 (AAA Arb. Nov. 26, 2024) (Ex. #2).

16.    As a result of the transfers and the Defendants' continued refusal to return the funds, Plaintiffs have been deprived of their property interests in the Payoff Proceeds and have suffered further damage in the form of lost interest and attorneys' fees.  In addition, by dissipating the traceable Payoff Proceeds belonging to Plaintiffs, CAL rendered itself undercapitalized and lacking sufficient assets to either repay the Payoff Proceeds owed to

1   Plaintiffs outright or to satisfy a judgment related to the theft of that property.

2                    **PARTIES AND NON-PARTY PARTICIPANTS**

3   **A.      Parties**

4          17.     Plaintiff Compeer Financial, ACA f/k/a AgStar Financial Services, ACA, is a

5   federally-chartered agricultural credit association headquartered in Sun Prairie, Wisconsin.

6   Plaintiff Compeer Financial, ACA is a citizen of Wisconsin under the Farm Credit Act.  12

7   U.S.C. § 2258.

8          18.     Plaintiff Compeer Financial, PCA f/k/a AgStar Financial Services, PCA, is a

9   federally-chartered production credit association, headquartered in Sun Prairie, Wisconsin, and

10  is a wholly-owned subsidiary of Compeer Financial, ACA.  Plaintiff Compeer Financial, PCA

11  is a citizen of Wisconsin under the Farm Credit Act.  12 U.S.C. § 2258.

12         19.     Plaintiff Compeer Financial, FLCA f/k/a AgStar Financial Services, FLCA, is a

13  federally-chartered land credit association, headquartered in Sun Prairie, Wisconsin, and is a

14  wholly-owned subsidiary of Compeer Financial, ACA.  Plaintiff Compeer Financial, FLCA is

15  a citizen of Wisconsin under the Farm Credit Act.  12 U.S.C. § 2258.

16         20.     Plaintiffs Compeer Financial, ACA, Compeer Financial, PCA, and Compeer

17  Financial, FLCA each conduct certain business under the brand name Agri-Access®, which is

18  a division and trademark of Compeer Financial, ACA.

19         21.     Defendant Dennis Morgan is an individual and, on information and belief, is the

20  Chief Financial Officer of CAL and a California resident who resides in Fresno, California.

21         22.     Plaintiffs are presently unaware of the business capacity of Defendant JD

22  Investments.   Upon information and belief, JD Investments a/k/a MD Investments, is an

23  unincorporated general partnership formed in California with its principal place of business in

24  Fresno, California.

25         23.     Plaintiffs are informed and believe and thereon allege that JD Investments is an

26  alias of MD Investments.  Upon information and belief, JD Investments aka MD Investments

27  is a California general partnership operated by Dennis Morgan.

28         24.     Defendant Kristi Iness is an individual and, on information and belief, is a

1  California resident who resides in Madera, California.

2  25.    Defendants Michael Graham and Cynthia Graham ("the Grahams") are

3  individuals and, on information and belief, are California residents who reside in Lemoore,

4  California.

5  **B.    Non-Party Participants**

6  26.    Non-Party Corporate America Lending, Inc., is a California corporation with its

7  principal place of business at 5610 N. Palm Ave, Fresno, California 93704.

8  27.    Non-Party Ron Cook is an individual that is the Chief Executive Officer of CAL

9  and, on information and belief, is a California resident who resides in Clovis, California.

10  **JURISDICTION AND VENUE**

11  28.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a).  The

12  Plaintiffs are all citizens of Wisconsin and the Defendants are all citizens of California.  The

13  amount in controversy exceeds $75,000, exclusive of interest and costs.  Specifically, this

14  dispute concerns $35,187,975.81 in traceable funds belonging to Plaintiffs that CAL and Ron

15  Cook unlawfully transferred to Defendants.

16  29.    This court has personal jurisdiction over the Defendants.  The Defendants are all

17  domiciled in the State of California.

18  30.    Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants Dennis

19  Morgan, Kristi Iness, Michael Graham and Cynthia Graham reside in this judicial district, JD

20  Investments appears to have its primary business address in this judicial district, and all

21  Defendants are residents of California.

22  31.    Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of

23  the events or omissions giving rise to the claim occurred in this judicial district.

24  **FACTUAL ALLEGATIONS**

25  **A.    The Master Participation Agreement and the Famoso Loans**

26  32.    Compeer Financial, ACA is a member-owned, Farm Credit cooperative serving

27  and supporting agriculture and rural communities.  Compeer provides loans, leases, risk

28  management and other financial services throughout 144 counties in Illinois, Minnesota, and

Wisconsin. In addition to Compeer's offering of loans, leases, and other financial services in the upper Midwest, Agri-Access is a Compeer business unit that provides financing and loan participations to banks and other loan originators across the country.

33. One way that Plaintiffs (conducting business as Agri-Access) provide capital for use in the origination of agricultural loans is by purchasing participation interests in loans originated by other agricultural lenders. Plaintiffs purchase an ownership interest in the principal amount of the loan, as well as an interest in the loan documents (such as the note, the loan agreement, and any security documents) and the underlying debt.

34. CAL, based in Fresno, California, is one such originator and servicer of agricultural loans and agricultural real estate loans. By selling participation interests in loans it originates, CAL gains access to additional sources of capital and minimizes its exposure to the borrowers of the loans after the loans have been originated.

35. Plaintiffs and CAL entered a participation agreement known as the Origination, Field Servicing and Master Participation Agreement on April 15, 2015 (the "MPA"). MPA (Ex. #3).

36. The MPA authorizes CAL to offer to sell to Plaintiffs participation interests in agricultural loans and/or agricultural real estate loans made by CAL to borrowers for purposes permitted under the Farm Credit Act and the regulations of the Farm Credit Administration. The MPA provides the general terms for such purchases, including the rights of the parties to the proceeds when the loans are repaid.

37. In or around 2018 and 2021, Plaintiffs paid a total of $58,000,000 to purchase 100% ownership interests—called "Participations"—in the economic aspects of two agricultural loans made by CAL to certain borrowers (the "Borrowers"), including Famoso Hills Ranch LLC and Famoso Hills Ranch II LLC (the "Famoso Loans"). 0800 Loan Certificate of Participation (Ex. #4); 3400 Loan Certificate of Participation (Ex. #5).

38. As set forth in Section 2.3 of the MPA, Plaintiffs' 100% Participation in the Famoso Loans "constitutes a purchase of an interest in the principal amount of the loan and an ownership interest in the Loan Documents and their underlying debt."

39.     As a result of its sale (and as subsequently confirmed by the sworn testimony of Ron Cook), CAL had no ownership interest in the underlying debt or the economic aspects of the Famoso Loans, but remained the lender of record and was paid a fee as the loan servicer.

40.     In accordance with Plaintiffs' ownership of the economic interest in the Famoso Loans, the Borrowers made their regular monthly interest and principal payments directly to Plaintiffs.

**B.     CAL'S Theft of the Payoff Proceeds**

41.     After several years of making regular monthly payments to Plaintiffs, the Borrowers decided in April 2024 to refinance the Famoso Loans through a different lender, PACT Capital, Inc. ("PACT").  Oct. 22 Tr. 136:14-18 (AAA Arb. Oct. 22, 2024) ("Oct. 22 Tr.") (Ex. #6).

42.     CAL became aware of this refinancing before it happened.[2]  Among other things, before the refinancing occurred, the Borrowers asked CAL to calculate payoff amounts for the Famoso Loans.  CAL provided those amounts on April 25, 2024, in the form of a "Demand for Payment in Full" for each of the Famoso Loans.  Together, the two Demands totaled $58,187,976.50—representing the full amount of outstanding principal, interest, and fees required to fully repay the Famoso Loans.  CAL 4/25 Payoff Demand (Ex. #7).

43.     CAL seized on this advance notice as an opportunity to intercept the Payoff Proceeds.  Instead of directing the Borrowers to pay Plaintiffs, CAL prepared the Demand for Payment in Full with instructions to wire the Payoff Proceeds directly to CAL.  CAL 4/29 Email to Delete ACH Info (Ex. #8).  CAL and its officers did not tell Plaintiffs about these Demands for Payment in Full, and Plaintiffs were not made aware of them (by PACT) until several days later.

44.     Around the same time, CAL's CEO Ron Cook took additional steps to prevent the payoff payment from being made to Plaintiffs and instead ensure that the repayment was sent to CAL.  Among other things, Mr. Cook terminated the standing ACH instructions that

---

[2] Plaintiffs were also generally aware that the Borrowers intended to refinance the Famoso Loans by virtue of a separate master participation agreement between Plaintiffs and PACT.

Plaintiffs used to obtain ordinary interest and principal payments from the Famoso Borrowers on a monthly basis. CAL 4/29 Email to Delete ACH Info (Ex. #8). Mr. Cook also changed the borrowers' address to one of CAL's office locations—a change the borrowers did not ask CAL to make. 5/14 Email from Famoso Borrower to CAL (Ex. #9).

45.     On April 29, 2024, the Borrowers closed on their refinancing transaction. As a result of the refinancing transaction, and CAL's surreptitious instructions to the Borrowers, on April 29, PACT wired CAL funds totaling $58,187,976.50 in full repayment of the Famoso Loans (the "Payoff Proceeds").

46.     Because Plaintiffs are the 100% owner of the economic interest in the Famoso Loans, the Payoff Proceeds (which were received "in full repayment" of the underlying debt) were, and remain, Plaintiffs' property.

47.     Indeed, numerous provisions of the MPA directly and indirectly required CAL to promptly remit the Payoff Proceeds to Plaintiffs. *See, e.g.*, MPA §§ 2.3, 4.6, 4.8, 4.13, 4.14, 4.16.

48.     In sworn testimony, Mr. Cook later admitted that Plaintiffs had a 100% economic interest in the loan principal, documents, and underlying debt.

49.     Despite its contractual obligations to do so, CAL never remitted the Payoff Proceeds to Plaintiffs or provided notice of the refinancing.

50.     Instead, having intercepted the Payoff Proceeds, CAL took various steps to conceal from Plaintiffs the fact that the Famoso Loans had been fully paid off and that CAL had received the Payoff Proceeds. Specifically, on May 2, 2024, Ron Cook initiated a one-time wire payment to Plaintiffs—not of the Payoff Proceeds but of the amount of the monthly principal and interest that would have been due to Plaintiffs on the Famoso Loans in May had the loan not already been paid off in full on April 29. CAL 5/2 Email Re Famoso May Payment (Ex. #10). That payment was an intentional lie to hinder and delay Plaintiffs' recovery—because the Famoso Loans had already been fully repaid on April 29, the Borrowers never made a monthly principal and interest payment for the month of May; Mr. Cook just made it up.

51.     CAL's efforts to fool Plaintiffs into thinking the Borrowers had not refinanced

the loan and had instead made a regular May principal and interest payment might have worked—but for the fact that Plaintiffs also have a participation agreement with PACT that allowed Plaintiffs to become generally aware of the refinancing of the Famoso Loans before it occurred.

52.    Thus, when CAL forwarded the purported May principal and interest payment for the loans, Plaintiffs had reason to believe that such loans had already been refinanced and paid off in full, and Plaintiffs became concerned and made repeated efforts to contact CAL to get information about the status of the Famoso Loans.

53.    Specifically, after receiving CAL's one-time wire payment, Plaintiffs' Managing Director Chad Steele attempted to contact CAL directly to better understand the situation.  Beginning on May 2, Mr. Steele called Mr. Cook's cell phone approximately five times and CAL's offices approximately five more times.  All ten calls went unanswered.

54.    Mr. Steele was finally able to get in contact with CAL's Chief Operating Officer Alex Aretakis by phone on the evening of May 2.  Mr. Aretakis denied knowledge of the repayment of the Famoso Loans (despite personally signing the Demands for Payment in Full just a few days earlier) and sought to delay further action and deflect responsibility for the situation onto Mr. Cook by asking Mr. Steele to "wait until Monday, when Ron returns to this office, so we can look into this matter further."

55.    CAL then went radio silent, and referred all further communications to its lawyers, who refused to provide any information about the whereabouts of the Payoff Proceeds—including whether CAL still possessed them.

**C.    Plaintiffs' Efforts to Recover the Payoff Proceeds, and CAL's Ongoing Refusal to Comply with Court and Arbitral Orders**

56.    Despite months of extensive efforts by Plaintiffs and its counsel—including orders from multiple arbitrators and a federal judge—CAL has refused to return the Payoff Proceeds belonging to Plaintiffs or to place them in escrow pending the resolution of the disputes between them.

57.    After initial, informal attempts to recover the Payoff Proceeds from CAL proved

1   unsuccessful, Plaintiffs initiated arbitration in accordance with the MPA on May 14, 2024.  The

2   following day, on May 15, 2024, Plaintiffs filed an application seeking the appointment of an

3   Emergency Arbitrator and issuance of an interim award to require CAL to return the Payoff

4   Proceeds immediately, or to place them in escrow pending resolution of the arbitration.

5        58.    Given the risk of irreparable harm to Plaintiffs if the Payoff Proceeds were

6   dissipated before the Emergency Arbitrator was appointed and available for a hearing, Plaintiffs

7   also pursued a temporary restraining order in aid of arbitration in the United States District

8   Court for the District of Minnesota, on May 21, 2024.

9        59.    On May 29, 2024, the District Court scheduled a status conference to discuss

10  Plaintiffs' motion.  During the conference, CAL's counsel twice assured the Court that the

11  entirety of the Payoff Proceeds was still in CAL's possession, which was false.

12       60.    The Court ordered a representative of CAL to appear later that day to provide

13  additional information about the location of the Payoff Proceeds.  Rather than comply with that

14  order, CAL's CEO, Ron Cook, submitted a declaration on May 29 admitting that "[o]n April

15  29, 2024 . . . CAL received wire payments totaling $58,187,976.50, in full repayment of the

16  Famoso Loans (the 'Payoff Proceeds')" and indicating that he was "willing to enter into an

17  agreement that preserves the Payoff Proceeds pending the resolution" of the arbitration process.

18  The declaration failed to disclose that Mr. Cook had already transferred large portions of the

19  Payoff Proceeds in the beginning of May.

20       61.    After receiving this declaration, the Court entered an order that same day

21  requiring CAL to establish an escrow account at a reputable financial institution, place the

22  Payoff Proceeds in that escrow account within five business days, and provide the Emergency

23  Arbitrator a detailed report outlining steps taken to preserve the Payoff Proceeds and comply

24  with the order.

25       62.    The Court's order was issued in aid of the arbitration, where Plaintiffs' request

26  for emergency relief was fully briefed and a separate hearing on that request had been scheduled

27  for June 3.

28       63.    In advance of June 3 hearing, the Parties *jointly* agreed to, drafted, and submitted

a proposed Interim Award for entry by the Emergency Arbitrator adopting the Court's Order, with minor procedural adjustments.  Following a hearing, the Interim Award was signed and issued by the Emergency Arbitrator on June 3 as proposed jointly by the Parties.

64.    Throughout the month of June, CAL and its counsel made numerous representations that Ron Cook and CAL were attempting to comply with the order requiring it to escrow the Payoff Proceeds.  However, CAL repeatedly defied these requirements, refusing either to place the Payoff Proceeds in escrow or produce compliant reports.

65.    In particular, both the Court's Order and the June 3 Interim Award required CAL to provide a "detailed report" on the steps taken to preserve the Payoff Proceeds since CAL received them on April 29.

66.    CAL refused to comply.  Rather than provide a "detailed report" as required, on June 3, it submitted a report of just four sentences.  That report indicated that, despite its prior assurances to the contrary, CAL had already transferred the Payoff Proceeds and put them to some other use.  The report, however, provided no information regarding the location of the funds or to whom they had been disbursed.  CAL Report (AAA Arb. June 3, 2024) (Ex. #11).

67.    In light of CAL's deficient report, the Emergency Arbitrator issued a Supplemental Interim Award requiring CAL to provide various specific categories of information regarding what CAL had done with the Payoff Proceeds.

68.    CAL submitted another report pursuant to the Order and the Interim Award on June 6.  That report again failed to provide any information about where the Payoff Proceeds were or what had been done with them for the past month.  Instead, CAL's June 6 Report revealed that after it had received the Payoff Proceeds—Plaintiffs' property—CAL had "invested" them "for purposes of preservation and creating a reasonable return on the funds."  CAL Report at 1 (AAA Arb. June 6, 2024) (Ex. #12).  More concerning, the report revealed that in the week between May 29 and June 6, CAL was  able to allegedly secure only $13,000,000 of the disputed funds up to that point (which was subsequently increased to $23,000,000).  And while CAL had supposedly undertaken efforts to open an escrow account, no such account had yet been opened.  To date, the $23,000,000 that CAL has recovered *still*

has not been placed in a compliant escrow account.  Oct. 22 Tr. 105–06 (Ex. #6).

69.    Plaintiffs continued to seek information from CAL regarding the location and status of the Payoff Proceeds, but CAL steadfastly refused to provide it—despite multiple orders from the Court and the Emergency Arbitrator that it do so.  Order at 2 (AAA Arb. July 16, 2024) (Ex. #13) (the emergency arbitrator noted on July 16 that "CAL has resolutely failed and refused to comply with most parts of the Court's Order and the Emergency Arbitrator's orders, despite having the ability to do so").  Plaintiffs were left entirely in the dark as to what CAL had done with the Payoff Proceeds and to whom CAL and Ron Cook had transferred them.

70.    In light of CAL's failure to comply with the awards and orders of the Emergency Arbitrator at every turn, Plaintiffs sought and obtained from the Emergency Arbitrator (1) a recommendation that the Court impose sanctions and (2) an interim award of attorneys' fees of $237,953.50 (which CAL still has not paid).

71.    On September 3, 2024, the Court held a show cause hearing, during which CAL's counsel admitted that CAL had not complied with the Court's May 29 Order or the orders of the Emergency Arbitrator.

72.    Following the show cause hearing, on September 20, 2024, the Court entered a further order in response to the Emergency Arbitrator's recommendation that the Court impose sanctions for CAL's noncompliance.  Specifically, the Court held that "[CAL's] 'cat and mouse' tactics have now defied two decisionmakers and led this Court to consider appointing a receiver to accomplish the tasks that [CAL] has refused for months.  The deadline for compliance has long since passed."  But because "the issue is not postured as a motion to enforce sanctions already awarded" and "the full arbitration panel has now been seated," the Court held that "the panel should have the opportunity to consider whether to adopt, vacate, or modify the Emergency Arbitrator's interim awards."

73.    Shortly thereafter, Plaintiffs petitioned the Merits Panel to adopt the Emergency Arbitrator's interim awards and to further sanction CAL for its non-compliance.  Following briefing from the parties and a two-hour oral argument, the Merits Panel scheduled a two-day

1    evidentiary hearing for the parties to present witness testimony, evidence, and argument.  That

2    two-day hearing occurred on October 22 and 23, 2024, and is described in more detail below.

3        74.    Following that hearing, the Merits Panel issued a Sanctions Order on November

4    26, which determined that CAL "willfully and without justification violated the previous Order

5    of the United States District Court, the Interim Awards and Order of the Emergency Arbitrator,

6    and the Interim Award of the Merits Panel."  Sanctions Order at 2 (AAA Arb. Nov. 26, 2024)

7    (Ex. #2).  In issuing the Sanctions Order, the Merits Panel emphasized its "concern[] that CAL

8    and its owner and CEO have misled the Panel relative to the disposition of the Payoff Proceeds."

9    *Id*.

10        75.    The Merits Panel concluded that "Mr. Cook has not acted credibly from the

11    beginning of litigation with Compeer, likely intending from the outset to convert the Payoff

12    Proceeds to his and CAL's own uses, and to ignore the orders of any court or arbitrator to do

13    otherwise" while engaging in a "litigation strategy of delay."

14    **D.    CAL Finally Reveals the Recipients of the Stolen Payoff Proceeds**

15        76.    As demonstrated by the history above, from the outset of this matter, Plaintiffs

16    have sought information from CAL regarding what it did with the Payoff Proceeds after it

17    received them.

18        77.    As Plaintiffs explained in their application for a supplement to the Interim

19    Award on June 4, 2024:

20        After stealing Agri-Access's property—those specific, traceable funds

21        comprising the Payoff Proceeds—CAL put them to some other use for its own

22        profit, and may have given some other third-parties rights or interests in some

23        portion of that property.   This additional information is therefore needed to

24        understand what happened to Agri-Access's property, how it is being

25        "reacquired" (or replaced), from whom, and under what circumstances and on

26        what terms.   Agri-Access needs that information immediately to evaluate

27        whether additional action and remedies, such as pre-judgment attachment(s) or

28        the issuance of a judicial lien, are necessary to ensure that Agri-Access's rights

to the Payoff Proceeds (or whatever is left of it) are not prejudiced by any other competing claims of other third-parties once Agri-Access prevails in this action.

78.     The Emergency Arbitrator granted Plaintiffs' request and ordered CAL to provide detailed information, but as noted above, CAL refused to comply.

79.     Indeed, in an effort to mollify Plaintiffs and assure the Emergency Arbitrator that Plaintiffs' concerns were unfounded, CAL and its counsel repeatedly represented that no one else had any claims to the Payoff Proceeds.

80.     For example, in a hearing before the Emergency Arbitrator on June 10, 2024, CAL's counsel stated: "As far as I know, I am not aware of any third party claiming a right to the funds."   CAL's counsel likewise represented that he would "provide the notice [to Claimant]" if any third-party ever asserted such a claim.

81.     Similarly, in its June 13, 2024 Report, CAL's counsel represented that "CAL is unaware of and does not believe there are any claims, rights or obligations asserted by any third party."

82.     On June 17, the Emergency Arbitrator issued a Second Supplemental Interim Order requiring CAL to "promptly notify [Agri-Access's counsel] if any individual or entity asserts any rights to, or otherwise refuses to return, any portion of the Payoff Proceeds."

83.     Neither CAL nor its counsel provided any such notice prior to November 15.

84.     When Ron Cook finally testified before the Merits Panel in the October 22 evidentiary hearing, it was Plaintiffs' first opportunity to examine Mr. Cook directly on what he had done with the Payoff Proceeds.

85.     In that hearing, Ron Cook testified under oath that the Payoff Proceeds were initially received and deposited in an account with Fresno First Bank on April 29, 2024, and that he is the only one at CAL with access to or control over the account.

86.     Mr. Cook testified that shortly thereafter, he transferred more than $35 million of the Payoff Proceeds to the Defendants in this action, whom Mr. Cook described as individuals in a trusted circle of associates he has known "from a young age" and with whom he conducts investments and other business dealings.

COMPLAINT

87.    During his testimony, Mr. Cook described the Defendants as "people I've known for many, many years, and it's done on handshakes and I trust them with everything."

88.    Dennis Morgan, upon information and belief, has served as CAL's Chief Financial Officer from 1997 to the present.  To the extent Mr. Morgan actually performs his responsibilities as CAL's CFO, he knew or should have known of both CAL's receipt of the Payoff Proceeds and CAL's obligations to promptly remit them to Plaintiffs.  Upon information and belief, including based on the sworn testimony of Ron Cook, he was also aware of CAL's improper purpose in transferring a portion of the Payoff Proceeds to him and his company JD Investments.

89.    Further, upon information and belief, Mr. Morgan is and has been aware of Plaintiffs' claims against CAL, and has taken action to aid CAL in connection with those claims.  For instance, on December 23, 2024, Mr. Morgan executed a sworn declaration that was provided by CAL's counsel in support of a motion by CAL to stay the arbitration pending resolution of an ongoing criminal investigation.

90.    Michael and Cynthia Graham are Ron Cook's business partners, as of November 4, 2024, in a limited liability company ("Prosperity Farms, LLC")  registered to the same address as CAL, which purports to own agricultural property in the Fresno area.  Prosperity Farms has a 50% ownership share in a ranch property, alongside a limited liability company owned and controlled by Mr. Cook.

91.    Upon information and belief, Michael Graham is and has been aware of Plaintiffs' claims against CAL, and has taken action to aid CAL in connection with those claims.  For example, in October 2024, Michael Graham and Ron Cook together executed a grant deed on behalf of Prosperity Farms, LLC for numerous parcels of real estate owned by Prosperity Farms, LLC.  Escrow Account Grant Deed (Ex. #17).  CAL provided this grant deed to its counsel and offered to the Merits Panel that this grant deed could serve as collateral to satisfy CAL's obligations to escrow the Payoff Proceeds as ordered by the Merits Panel.[3]

92.    Mr. Cook testified that Kristi Iness is his long-term client with whom he has an

---

[3] The Merits Panel rejected this offer as inadequate.

1   ongoing business relationship.  Mr. Cook is the sole member of a limited liability company

2   bearing Ms. Iness' name ("Iness Properties, LLC"), which was registered from the same address

3   as CAL.

4         93.   Mr. Cook further identified Michael Graham, Dennis Morgan, and Kristi Iness

5   as three close friends and private investors who would be able to assist him in satisfying a

6   judgment or award in the ongoing arbitration, given CAL's undercapitalization.  Despite his

7   assurances that this inner circle would assist with satisfying a judgment, Mr. Cook later testified

8   that these individuals have no agreements to provide any funding to Ron Cook or CAL.  When

9   asked whether he could re-acquire the portion of the Payoff Proceeds he had transferred to

10   Defendants, Mr. Cook further testified he would need to ask Defendants to do so and see how

11   they respond: "[W]e would just decide what to do…. [W]e're business partners. We would talk

12   it through."

13         94.   Following Mr. Cook's examination, the Merits Panel ordered him and CAL to

14   produce bank records reflecting the transactions made to the Defendants that were the subject

15   of his sworn testimony.

16   **E.   The Transfers of the Payoff Proceeds**

17         95.   CAL finally produced partial, heavily-redacted bank records on October 23 and

18   25, 2024.

19         96.   Although those records yet again fell well short of the detail Plaintiffs had

20   requested and CAL had been ordered to provide, the little information they did reveal was

21   nevertheless shocking.

22         97.   The records show that CAL waited until *after* Plaintiffs inquired about the

23   Payoff Proceeds on May 2 to make any transfers to the Defendants in this action.

24         98.   Indeed, Mr. Cook did not transfer any of the funds until May 3, *after* Mr. Steele

25   had repeatedly called both Mr. Cook and Mr. Aretakis seeking information about the Payoff

26   Proceeds, and *after* Mr. Aretakis had attempted to buy time by asking Mr. Steele to "wait until

27   Monday, when Ron returns to this office, so we can look into this matter further."

28         99.   The records demonstrate that, before transferring the funds, CAL held the Payoff

Proceeds in its account with Fresno First Bank bearing an account number ending in 3283 ("FFB Account").

100.    Beginning on May 3, 2024, CAL, through Ron Cook, initiated a series of transfers to move a portion of the Payoff Proceeds to the Defendants.

101.    In total, CAL transferred $35,187,975.81 to the Defendants (the "Inner Circle Transfers"), as reflected in heavily-redacted records CAL produced:



1.    **The Morgan Transfers**

102.    On or about May 3, 2024, CAL transferred $5,419,000 from its FFB Account to JD Investments ("5/3 Morgan Transfer").  CAL 4/30 Bank Statement (Ex. #14).  Upon information and belief,  JD Investments is an entity owned or controlled by Dennis Morgan.

103.    On or about May 6, 2024, CAL transferred another $10 million from its FFB Account to JD Investments ("5/6 Morgan Transfer").  *Id.*

104.    Together, $15,419,000 in Payoff Proceeds was wired to the JD Investments account in two transactions (collectively, the "Morgan Transfers").

105.    As CAL's CFO, Mr. Morgan knew or should have known of both CAL's receipt of the Payoff Proceeds and CAL's obligations to promptly remit them to Plaintiffs, but accepted the Morgan Transfers anyway, thereby aiding Ron Cook's efforts to hinder and delay Plaintiffs'

1    receipt of the Payoff Proceeds.

2        106.    On October 22, 2024, Mr. Cook provided testimony sworn under penalty of

3    perjury that the Morgan Transfers comprised a portion of the Payoff Proceeds and that Dennis

4    Morgan did not provide consideration in exchange for the funds.  Instead, the money transfer

5    was based on their "trusted valued relationship."

6        107.    Mr. Cook also testified under oath that there is no written agreement regarding

7    the Morgan Transfers, saying "there was no agreements."

8        108.    Mr. Cook also testified that he personally requested that Morgan keep the

9    money in his account until Mr. Cook could determine what to do with it.

10       109.    Mr. Cook further testified that it would be possible to reacquire the funds after

11   discussing the matter with Mr. Morgan.  Despite multiple court and arbitral orders to place the

12   money in a compliant escrow account, and CAL's counsel's written and oral representations on

13   the record to the Emergency Arbitrator that CAL was working diligently to reacquire the Payoff

14   Proceeds, Mr. Cook testified that he had not requested Mr. Morgan to return the funds.

15                        **2.    The Iness Transfer**

16       110.    On or about May 6, 2024, CAL, through Mr. Cook, transferred $5,400,000 from

17   its FFB Account to Kristi Iness ("Iness Transfer").  CAL 4/30 Bank Statement (Ex. #14).

18       111.    On October 22, 2024, Mr. Cook testified under oath that the Iness Transfer

19   comprised a portion of the Payoff Proceeds and that Iness did not provide consideration in

20   exchange for the funds.

21       112.    Mr. Cook also testified under oath that there is no written agreement regarding

22   the Iness Transfer.  Instead, it was a transaction "done on handshakes," and Mr. Cook never

23   even asked Ms. Iness where she would keep the money.

24       113.    Mr. Cook further testified that he would be able to reacquire the funds from Ms.

25   Iness through a simple "conversation."  But despite multiple court and arbitral orders to place

26   the money in a compliant escrow account and representations by CAL's counsel that CAL was

27   working to do so, Mr. Cook testified that he had not requested Ms. Iness to return the funds.

28

### 3.      The Graham Transfers

114.    On or about May 3, 2024, CAL, through Mr. Cook, transferred $12,173,792 from its FFB Account to Michael and Cynthia Graham ("5/3 Graham Transfer").  CAL 4/30 Bank Statement (Ex. #14).

115.    In addition, on or about May 22, 2024, CAL transferred an additional $3,387,000 from its FFB account to the Grahams ("5/22 Graham Transfer").  CAL 5/22 Wire Transfer (Ex. #15).  By email dated October 25, 2024, CAL's counsel represented that $2,195,183.81 of the 5/22 Graham Transfer was a portion of the Payoff Proceeds.

116.    Mr. Cook testified that the $14,368,975.81 transferred to Mr. Graham in May comprised a portion of the Payoff Proceeds (collectively, the "Graham Transfers").

117.    Mr. Cook further testified under oath that there is no written agreement regarding the Graham Transfers and that Mr. Cook "told [Mr. Graham] to just go ahead and hold it in the account."

118.    Mr. Cook denied that he used the Graham Transfers to purchase a property interest from Mr. Graham.  Rather, he characterized the value he received as "ongoing business relationships."  Specifically, Mr. Cook and the Grahams intended to set aside the money to continue generating investment returns.

119.    In Mr. Cook's words, the "terms of the ability to get the money back are to go ahead and ask [Mr. Graham] to give it back."  But despite multiple court and arbitral orders to place the funds in a compliant escrow account and representations by CAL's counsel that CAL was working to do so, Mr. Cook testified that he had not requested Mr. Graham to return the funds.

120.    Mr. Cook further implied that Mr. Graham was a confidante with whom he had strategized regarding the orders entered against CAL.  Specifically, Mr. Cook testified that rather than comply with the orders against CAL, he and Mr. Graham decided to place the money from the Graham Transfers in a Bank of Sierra account to earn interest income.

121.    The Merits Panel later observed, in its November 26, 2024 Sanctions Order that Mr. Cook's testimony on this point had led it to "believe such funds were transferred simply so

1   the transferees could invest them and draw a yield."

2     **F.**     **THE DEFENDANTS REFUSED TO RETURN THE FUNDS.**

3       122.   Immediately upon the conclusion of the October 22 and 23 hearing, the Merits

4   Panel issued an order to CAL and Mr. Cook to preserve the status quo.  On the record on

5   October 23, the Merits Panel ordered as follows:

6       The panel further orders that CAL immediately advise Michael Graham, Dennis

7       Morgan, and Kristi Iness that the funds received from CAL and Ron Cook this

8       year are subject to litigation before the American Arbitration Association, and

9       that the arbitrators have preliminarily found, A, that these funds that Graham,

10      Morgan, and Iness currently hold are the property of another party and not the

11      property of CAL or Mr. Cook; and, B, that these funds should be maintained

12      pending a further order of the arbitrators. We ask that this communication be

13      made to those three recipients no later than 5:00 p.m. Pacific time today,

14      obviously by e-mail, today, October 23, 2024, with the panel and the Claimant

15      – Claimant's counsel copied on the communication.

16       123.   In accordance with that order on the record, between October 23-24, 2024,

17   counsel for CAL sent emails to the Defendants providing notice that the Inner Circle Transfers

18   were the subject of litigation and had been preliminarily found to be "the property of another

19   party and not the property of CAL or Mr. Cook." The Defendants were each made aware that

20   the funds are the property of another party and are subject to an AAA interim order.

21       124.   Several days later, on October 28, 2024, the Merits Panel issued a detailed

22   written order adopting the Emergency Arbitrator's awards without modification and ordering

23   CAL to reacquire the funds Mr. Cook had transferred to the Defendants and place the entirety

24   of the Payoff Proceeds in a compliant escrow account by November 15, 2024.  Interim Award

25   at 3 (AAA Arb. Oct. 28, 2024) (Ex. #16).

26       125.   Among other things, the Order further found that "Compeer has shown a

27   likelihood that it will prevail on the merits of its claims to ownership of the Payoff Proceeds, []

28   while CAL has failed to show that it would be materially harmed by the requirement of

1    preservation."

2         126.    The October 28 Interim Award similarly provided that: "Neither CAL nor

3    Compeer, nor anyone acting in concert with them, shall take any action to dispose, dissipate,

4    encumber, or otherwise impair the value of the Payoff Proceeds or the escrow account, except

5    as permitted by order of this Panel."

6         127.    As has been its *modus operandi* to date, CAL once again refused to comply with

7    the orders that bind it.

8         128.    This time, CAL's counsel submitted a sworn declaration from Mr. Cook on

9    November 15, 2024, claiming that Mr. Cook had made various efforts to reclaim the funds from

10   each of the Defendants, but was unsuccessful because each of the Defendants refused Mr.

11   Cook's requests to return the Inner Circle Transfers.  Specifically, Mr. Cook's declaration

12   revealed that even though he had "talked it through" with his so-called "business partners" (as

13   he had characterized the Defendants in his sworn testimony on October 22) in more than a

14   dozen separate conversations, they each responded—identically—that "The money was

15   received and was invested prior to October 23, 2024, and said investments will not be recovered

16   or liquidated."

17        129.    As to his attempts to recover the Morgan Transfers, Mr. Cook declared under

18   penalty of perjury that he communicated with Dennis Morgan on October 24, 28, 29, 30, and

19   November 4, 5, 6, 11, and 13.  Mr. Cook further declared that: "On each occasion wherein Mr.

20   Morgan was contacted I made a request for the money to be returned to CAL.  I reiterated to

21   Mr. Morgan the contents of the October 23, 2024, email which was sent to him at the direction

22   of this panel.  Mr. Morgan stated that he received the funds from CAL and said funds were the

23   repayment of obligations owed by CAL to him.  The money was received and was invested

24   prior to October 23, 2024, and said investments will not be recovered or liquidated."

25        130.    As to his attempts to recover the Iness Transfer, Mr. Cook declared under

26   penalty of perjury that he communicated with Kristi Iness on October 28 and 30, and November

27   11, 2024.  Mr. Cook further declared that: "on each occasion wherein Mrs. Iness was contacted

28   I made a request for the money to be returned to CAL.  I reiterated to Mrs. Iness the contents

of the October 23, 2024, email which was sent to him [sic] at the direction of this panel.  Mrs. Iness stated that she received the funds from CAL and said funds were the repayment of obligations owed by CAL to her.  The money was received and was invested prior to October 23, 2024, and said investments will not be recovered or liquidated."

131.    As to his attempts to recover the Graham Transfers, Mr. Cook declared under penalty of perjury that he communicated with Mike Graham on October 23, 2024.  Mr. Cook further declared that: "on each occasion wherein Mr. Graham was contacted I made a request for the money to be returned to CAL.  I reiterated to Mr. Graham the contents of the October 23, 2024, email which was sent to him at the direction of this panel.  Mr. Graham stated that he received the funds from CAL and said funds were the repayment of obligations owed by CAL to him.  The money was received and was invested prior to October 23, 2024, and said investments will not be recovered or liquidated."

132.    The Merits Panel reviewed Mr. Cook's November 15 Declaration and observed that the transferee's refusals were each stated "with remarkable uniformity."

133.    To date, the Defendants have not returned, and according to Mr. Cook's sworn declaration testimony are refusing to return, the Inner Circle Transfers.  Neither Defendants nor CAL nor Mr. Cook have provided any information regarding the purported obligations CAL supposedly had to Defendants for which the transfers were allegedly repayments.  Indeed, as the Merits Panel noted, Mr. Cook's "prior testimony made no mention of any conceivable obligation owed by [CAL] to the transferees."  Mr. Cook's November 15 Declaration also failed to articulate any position on whether CAL owed obligations to the transferees.  Defendants have not themselves submitted any declarations or other statements attesting to the existence of any obligation CAL had to them.  Nor have they denied awareness at the time they received the transferred funds that the funds were Payoff Proceeds belonging to Plaintiffs.  Even if they had, any such obligation would not override Plaintiffs' entitlement to the funds in question.

**G.    CAL's Insolvency**

134.    CAL has admitted that it does not have sufficient assets to satisfy the claims asserted by Plaintiffs against CAL based upon or related to the Payoff Proceeds.

135.    CAL has further admitted that, as of October 2024, the gross amount of its assets were significantly less than Plaintiffs' claims against CAL (not including other liabilities on CAL's balance sheet).

136.    The Inner Circle Transfers left CAL with unreasonably small amounts of capital, including cash and cash equivalents, to satisfy its obligations, including its obligations to Plaintiffs.  In the arbitration, given CAL's lack of solvency, CAL relied on assets it did not own, namely a grant deed for real estate owned by Prosperity Farms, LLC, as a means of demonstrating CAL's purported ability to satisfy its obligations to Plaintiffs.

137.    CAL has not been paying its debts to Plaintiffs and certain other institutions, including its obligations under various sanctions orders, as they become due.

138.    CAL intended, reasonably believed, or had reason to know that the Inner Circle Transfers would result in CAL's inability to pay its obligations to Plaintiffs and result in CAL having inadequate capital.

### FIRST CAUSE OF ACTION

### CONVERSION

### (Against All Defendants)

139.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph as if set forth in full.

140.    Plaintiffs owned 100% of the Payoff Proceeds under the terms of the MPA and had the right to possess such amounts.  Defendants have taken the portion of the Payoff Proceeds that they received and have converted such funds to their own use.

141.    The Defendants have actual notice of Plaintiffs' claim to the funds constituting the Inner Circle Transfers and the Defendants continue to refuse to return Plaintiffs' property.

142.    These acts intentionally deprive the Plaintiffs of their rightful possession to the Payoff Proceeds.  The Plaintiffs never consented to the Defendants' exercise of control over portions of the Payoff Proceeds.

143.    Defendants knew or should have known that the Payoff Proceeds belonged to Plaintiffs and acted in willful and conscious disregard of Plaintiffs' rights to the Payoff Proceeds

1   by refusing to return them.

2       144.    Upon information and belief, including based on the sworn testimony of Ron

3   Cook, Defendants knew of Mr. Cook's improper purpose in making the Inner Circle Transfers

4   and intentionally concealed material facts known to them with the intention of depriving

5   Plaintiffs of their property.  Despite all the red flags surrounding Mr. Cook's discussions and

6   instructions to them in assisting him with dissipating and hiding the funds, they nonetheless

7   went along with the nefarious scheme and accepted the funds to hold, and continue to hold and

8   refuse to return the Payoff Proceeds to Plaintiffs.

9       145.    Accordingly, Plaintiffs were deprived of possession of the Payoff Proceeds and

10  have suffered damages in an amount to be determined at trial.

11      146.    Additionally, because the Defendants acted with willfulness, oppression, fraud,

12  and/or malice, and for a despicable and patently unlawful purpose of harming Plaintiffs,

13  Plaintiffs are entitled to an award of punitive damages.

14                          **SECOND CAUSE OF ACTION**

15                        **AIDING AND ABETTING CONVERSION**

16                            **(Against All Defendants)**

17      147.    Plaintiffs reallege and incorporate herein by reference each and every foregoing

18  paragraph as if set forth in full.

19      148.    Plaintiffs are informed and believe, and thereon allege, that Defendants had

20  actual knowledge that an act of conversion was going to be committed by CAL and Ron Cook

21  regarding the Payoff Proceeds.  Indeed, despite all the red flags surrounding Mr. Cook's

22  discussions and instructions to them in assisting him with dissipating and hiding the funds, they

23  nonetheless went along with the nefarious scheme and accepted the funds to hold, and continue

24  to hold and refuse to return the Payoff Proceeds to Plaintiffs, in furtherance of CAL's and Mr.

25  Cook's ongoing conversion of Plaintiffs' property.

26      149.    Given the highly unusual and suspicious circumstances by which the Inner

27  Circle Transfers were made to Defendants, as alleged in detail above, Plaintiffs are informed

28  and believe that Defendants were knowingly complicit and aided and abetted CAL and Mr.

1    Cook in these fraudulent efforts by accepting and receiving the funds and refusing to return

2    them.

3         150.    Defendants each provided substantial assistance or encouragement to Ron Cook

4    or CAL to deprive Plaintiffs of their property.

5         151.    Defendants acted in willful, malicious, and conscious disregard of Plaintiffs'

6    rights to the Payoff Proceeds, and for a despicable and patently unlawful purpose of assisting

7    CAL and Mr. Cook in harming Plaintiffs.

8         152.    Plaintiffs have been damaged as a result of the Defendants' conduct.

9         153.    Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an

10   amount to be determined at trial.

11                        **THIRD CAUSE OF ACTION**

12                     **FOR MONEY HAD AND RECEIVED**

13                        **(Against All Defendants)**

14        154.    Plaintiffs reallege and incorporate herein by reference each and every foregoing

15   paragraph as if set forth in full.

16        155.    Defendants received the Inner Circle Transfers constituting Plaintiffs' property

17   that CAL was obligated to turn over to the Plaintiffs.

18        156.    Defendants did not use the Inner Circle Transfers for the benefit of the Plaintiffs

19   or remit the funds to Plaintiffs.  Instead, they retained the funds.

20        157.    When requested to return the funds, Defendants each refused.

21        158.    Accordingly, Plaintiffs were deprived of possession of the Payoff Proceeds and

22   have suffered damages in an amount to be determined at trial.

23                        **FOURTH CAUSE OF ACTION**

24                  **CIVIL THEFT (Cal. Penal Code § 496(c))**

25                        **(Against All Defendants)**

26        159.    Plaintiffs reallege and incorporate herein by reference each and every foregoing

27   paragraph as if set forth in full.

28        160.    Through the Inner Circle Transfers, each Defendant received property that was

1    stolen from Plaintiffs or obtained in a manner constituting theft.

2        161.    On information and belief, each Defendant knew, upon receiving the Inner

3    Circle Transfers, that the property was stolen from Plaintiffs or obtained in a manner

4    constituting theft.

5        162.    Plaintiffs have been damaged as a result of the Defendants' conduct.

6        163.    Accordingly, Plaintiffs are entitled to three times the amount of actual damages

7    they have sustained, their costs of suit, and their reasonable attorney's fees.

8                              **FIFTH CAUSE OF ACTION**

9                        **ACTUAL FRAUDULENT CONVEYANCE**

10                       **(Cal. Civ. Code § 3439.04(a)(1))**

11                              **(Against All Defendants)**

12        164.    Plaintiffs reallege and incorporate herein by reference each and every foregoing

13    paragraph as if set forth in full.

14        165.    In the alternative to the foregoing causes of action, the Inner Circle Transfers

15    are also avoidable as actual fraudulent conveyances.  Plaintiffs are present creditors of CAL

16    and were creditors of CAL prior to and on the date of each of the Inner Circle Transfers.

17        166.    Each of the Inner Circle Transfers were made by CAL.  To the extent that the

18    Payoff Proceeds do not constitute Plaintiffs' property, the Payoff Proceeds were property of

19    CAL at the time that the Inner Circle Transfers were made.

20        167.    Upon information and belief, CAL made the Inner Circle Transfers with the

21    actual intent to hide and sequester the Payoff Proceeds and prevent Plaintiffs from learning their

22    location in order to hinder, delay or defraud Plaintiffs, creditors of CAL, in their efforts to

23    recover them. As the allegations above show, CAL took a number of steps that demonstrated

24    its unlawful intent, including, among other things: (i) CAL on May 2 made a payment to

25    Plaintiffs that it falsely characterized as a regular interest payment, even though the Famoso

26    Loans had been paid in full and CAL had received the Payoff Proceeds; (ii) CAL made the

27    Inner Circle Transfers after Plaintiffs had inquired into the missing Payoff Proceeds and

28    threatened legal action; (iii) CAL made the Inner Circle Transfers shortly after its obligation to

turnover the Payoff Proceeds to Plaintiffs matured; (iv) CAL made the Morgan Transfers to an insider, its own CFO; (v) CAL did not make the Inner Circle Transfers in exchange for consideration or reasonably equivalent value; (vi) as a result of the Inner Circle Transfers, CAL was insolvent; (vii) CAL knew or had reason to know that it would not be able to satisfy its obligations to Plaintiffs as a result of the Inner Circle Transfers; and (viii) CAL concealed the existence of the Inner Circle Transfers from Plaintiffs both before and after Plaintiffs commenced litigation and arbitration against CAL, and did not disclose the amounts, dates, or recipients of the transfers until Ron Cook testified under penalty of perjury over four and a half months after the commencement of litigation and arbitration. These acts, and the totality of the circumstances surrounding the Inner Circle Transfers, demonstrate that CAL had the actual intent to hinder, delay and defraud Plaintiffs.

168.    Accordingly, the Inner Circle Transfers should be avoided or the value of the Inner Circle Transfers should be returned to CAL.

## SIXTH CAUSE OF ACTION

### CONSTRUCTIVE FRAUDULENT CONVEYANCE

### (Cal. Civ. Code § 3439.04(a)(2))

### (Against All Defendants)

169.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph as if set forth in full.

170.    In the alternative to the first through fifth causes of action, the Inner Circle Transfers are avoidable as constructive fraudulent conveyances.

171.    Plaintiffs are present creditors of CAL and were creditors of CAL prior to and on the date of each of the Inner Circle Transfers.

172.    Each of the Inner Circle Transfers was made by CAL. To the extent that the Payoff Proceeds do not constitute Plaintiffs' property, the Payoff Proceeds were property of CAL at the time that the Inner Circle Transfers were made.

173.    CAL did not receive reasonably equivalent value from Defendants for the Inner Circle Transfers.

174.    At the time that CAL made the Inner Circle Transfers, it was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small.

175.    Additionally, at the time that CAL made the Inner Circle Transfers, it intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

176.    Accordingly, the Inner Circle Transfers should be avoided or the value of the Inner Circle Transfers should be returned to CAL.

**SEVENTH CAUSE OF ACTION**

**CONSTRUCTIVE FRAUDULENT CONVEYANCE**

**(Cal. Civ. Code § 3439.05)**

**(Against All Defendants)**

177.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph as if set forth in full.

178.    In the alternative to the first through fifth causes of action, the Inner Circle Transfers are avoidable as constructive fraudulent conveyances.

179.    Plaintiffs are present creditors of CAL and were creditors of CAL whose claim arose before CAL made the Inner Circle Transfers.

180.    Each of the Inner Circle Transfers was made by CAL.  To the extent that the Payoff Proceeds do not constitute Plaintiffs' property, the Payoff Proceeds were property of CAL at the time that the Inner Circle Transfers were made.

181.    CAL did not receive reasonably equivalent value from Defendants in exchange for the Inner Circle Transfers.

182.    As a result of the Inner Circle Transfers, CAL became insolvent because it was left with unreasonably small capital and the sum of its debts exceeded the fair value of its assets.

183.    Accordingly, the Inner Circle Transfers should be avoided or the value of the Inner Circle Transfers should be returned to CAL.

1

**DEMAND FOR JURY TRIAL**

2        184.    Plaintiffs hereby demand a jury trial on all issues triable of right by jury.

3

**PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiffs pray that the Court enter judgment on each of Plaintiffs'

5    claims in favor of the Plaintiffs, and against each of the Defendants jointly and severally, and

6    further enter an order awarding the following relief:[4]

7            a)  Imposing a constructive trust and/or equitable lien on the Payoff Proceeds and any

8                assets purchased therewith or profits, proceeds, or financial gains acquired or

9                received thereon held by each of the Defendants;

10           b)  Ordering an injunction against further disposition of the Payoff Proceeds and any

11               assets purchased therewith or profits, proceeds, or financial gains acquired or

12               received thereon held by each of the Defendants;

13           c)  Issuing a writ for prejudgment attachment on Defendants' assets under Cal. Civ.

14               Proc. Code §§ 484.090, 483.010, and Cal. Civil Code § 3439.07, sufficient to secure

15               the fixed or readily ascertainable amounts of $14,368,975.81 as to Cynthia Graham

16               and Michael Graham, $15,419,000 as to Dennis Morgan and JD Investments, and

17               $5,400,000 as to Kristi Iness;

18           d)  An award of money damages in an amount to be determined by the trier of fact, plus

19               prejudgment interest;

20           e)  An award of three times the amount of actual damages sustained by Plaintiffs;

21           f)  Avoidance of each Inner Circle Transfer or the payment of cash in an amount equal

22               to the value of each Inner Circle Transfer;

23           g)  Restitutionary disgorgement of the amounts of the Defendants' unjust enrichment

24               in the amount of the Graham Transfers ($14,368,975.81), Morgan Transfers

25               ($15,419,000), and the Iness Transfer ($5,400,000), plus interest and any profits or

26               financial gains acquired or derived therefrom;

27

28

---

[4] Should this Court order the Defendants to transfer the Inner Circle Transfers to Plaintiffs, and Plaintiffs obtain the Inner Circle Transfers, Plaintiffs will comply with any orders of the Merits Panel regarding those funds.

COMPLAINT

h)    Awarding Plaintiffs the costs of this present action, including attorneys' fees;

i)    An award of punitive damages in an amount to be determined at trial;

j)    Such other relief as this Court may deem just.

Dated: January 10, 2025                    JONES DAY


                                           By:  */s/ Darren Cottriel*
                                           _____


                                           Christopher Lovrien, CA Bar No. 230546
                                           Joseph J. Boylan, CA Bar No. 331991
                                           Joshua M. Mester, CA Bar No. 194783
                                           JONES DAY
                                           555 S. Flower St., 50th Floor
                                           Los Angeles, CA 90071
                                           Telephone:    +1.213.489.3939
                                           Facsimile:     +1.213.243.2539
                                           cjlovrien@jonesday.com
                                           jboylan@jonesday.com
                                           jmester@jonesday.com

                                           Darren Cottriel, CA Bar No. 184731
                                           JONES DAY
                                           3161 Michelson Dr., # 800
                                           Irvine, CA 92612
                                           Telephone:    +1 949.851.3939
                                           Facsimile:     +1 949.553.7539
                                           dcottriel@jonesday.com

                                           William D. Coglianese (*pro hac vice* forthcoming)
                                           Michael Bradley (*pro hac vice* forthcoming)
                                           JONES DAY
                                           51 Louisiana Ave. NW
                                           Washington, DC 20001
                                           Telephone:    +1.202.879.3939
                                           Facsimile:     +1.202.626.1700
                                           wcoglianese@jonesday.com
                                           michaelbradley2@jonesday.com

                                           *Attorneys for Plaintiffs*
                                           *Compeer Financial, ACA,*
                                           *Compeer Financial, PCA, and*
                                           *Compeer Financial, FLCA*

COMPLAINT